1  Andrew P. Young, CA Bar No. 326540
   ayoung@swlaw.com
2  SNELL & WILMER L.L.P.
   3611 Valley Centre Drive, Ste. 500
3  San Diego, California 92130
   Telephone:  858.434.5020
4  Facsimile:   858.434.5006

5  Emily E. Statham, D.C. Bar No. 90021766;
   MD Bar No. 2211290207*
6  estatham@swlaw.com
   SNELL & WILMER L.L.P.
7  2001 K Street NW Ste. 425
   Washington, D.C. 20006
8  Telephone: 771-772-5506

9  Robert Durkin, PA Bar No.206065; D.C. Bar
   No. 90028430*
10 rdurkin@awglaw.com
   Amin Wasserman Gurnani
11 5185 MacArthur Blvd NW
   Suite 230
12 Washington, D.C. 20016
   Telephone :202 921 3673
13 Facsimile: 312 884 7352

14
15 *Pro hac vice application forthcoming

   Attorneys for Plaintiff
16 Ashlynn Marketing dba KRAVE

17              UNITED STATES DISTRICT COURT

18           SOUTHERN DISTRICT OF CALIFORNIA

19

20
   ASHLYNN MARKETING dba KRAVE          Case No. '25CV1430 RSH SBC
21
                Plaintiff,              **VERIFIED COMPLAINT FOR
22                                      DECLARATORY AND
          v.                           INJUNCTIVE RELIEF**
23
   ERICA PAN, in her official capacity as
24 Director of the California Department of
   Public Health, and ROB BONTA, in his
25 official capacity as Attorney General of
   California
26
                Defendants.
27

28

SNELL
& WILMER

1    Plaintiff Ashlynn Marketing dba Krave ("Ashlynn") hereby complains of

2   Defendants the California Department of Public Health and the Attorney General of

3   California ("Defendants") and alleges as follows:

### I. INTRODUCTION AND NATURE OF CLAIMS

5    1.    Kratom refers to the leaves of *Mitragyna speciosa*, a tropical tree in the

6   coffee family native to Southeast Asia. For centuries, people in countries like

7   Thailand and Indonesia have consumed kratom by eating the leaves whole in foods,

8   chewing the leaves, brewing leaves into a tea, grinding the leaves into a powder and

9   consuming the powder, or creating an extract. Historically, many Asian cultures used

10   kratom during socio-religious ceremonies; to treat chronic pain and various medical

11   conditions; and to increase energy, focus, and enhance general well-being.

12    2.    Ashlynn owns and operates a small, family-owned business that

13   manufacturers and sells kratom products throughout the United States.  Its warehouse

14   and manufacturing facility is in Santee, California.

15    3.    On May 15, 2025, the California Department of Public Health

16   ("CDPH") inspected Plaintiff's warehouse and issued a Noticed of Violation

17   ("NOV") thus embargoing all kratom products that were in the Santee warehouse.

18   The embargoed kratom products consist of kratom in the form of both unprocessed,

19   unlabeled raw ingredients and finished, labeled products comprised of kratom.  The

20   full monetary value of these kratom raw ingredients and finished products exceeds

21   two million dollars. A significant portion of this product was intended for export to

22   retailers and customers in states outside of California.

23    4.    According to CDPH, the products were embargoed because they were

24   "adulterated products that contain an unsafe food additive" and "were misbranded."

25   CDPH also asserted that Ashlynn was "manufacturing and holding food products

26   intended for consumption" without a "valid Processed Food Registration issued by

27   the California Department of Public Health." The NOV does not allege that the

28   kratom was contaminated, maintained in unsanitary conditions, or was otherwise

SNELL & WILMER

VERIFIED COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

1    dangerous. CDPH's claim that the kratom is "unsafe" is based exclusively on the fact

2    it is kratom, not that it is contaminated.

3        5.    As noted above and below, Ashlynn's kratom products are lawfully sold

4    throughout the United States in compliance with the laws of other states. A significant

5    portion of the inventory embargoed by the State of California was intended for export

6    to other states. As a result of the NOV and embargo, Ashlynn has been unable to

7    fulfill orders from existing customers located throughout the United States and could

8    potentially go out of business.  Notably, none of the embargoed kratom was intended

9    to be exported to any state or municipality that does not permit the sale of kratom.

10        6.    On May 19, 2025, Ashlynn informed the State of California that its

11    embargo was misplaced because, in part, its embargo over products that were

12    intended to be lawfully sold in other states was an "unlawful restraint on trade" in

13    violation of the United States Constitution, specifically the Commerce Clause.

14        7.    On May 27, 2025, CDPH responded stating that the "Department has

15    determined that the embargoed products are adulterated and will not allow the

16    adulterated products to be released for further distribution," including out-of-state

17    export to other states. The response further instructed Ashlynn to submit a plan for

18    the disposition (e.g., destruction) of Ashlynn's kratom inventory within 10 days or

19    the matter would be referred to the San Diego Office of the District Attorney. The

20    State of California did not respond to the argument that its embargo violated the

21    United States Constitution's Commerce Clause.

22        8.    On May 27, 2025, CDPH issued an embargo notice to Ashlynn.  The

23    notice embargoed 29 discrete kratom products housed in Ashlynn's Santee,

24    California, warehouse, including capsules in bottles, capsules in pouches, capsules in

25    sealed clear bags, powder in bottles, and liquid.  According to CDPH, the May 27,

26    2025, embargo "supersedes [the] blanket embargo made on 05/15/2025."

27        9.    Plaintiff Ashlynn Marketing brings this action to enjoin CDPH from

28    continuing to embargo Ashlynn's legally obtained and legally distributed inventory

VERIFIED COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

1 of kratom products and from enforcing its embargo on kratom products intended to

2 be exported to states where the sale of kratom is not prohibited.

## II. THE PARTIES

10.     Plaintiff Ashlynn is a corporation organized and existing under the laws of the State of California, having its principal place of business at 9316 Wheatlands Rd. Suite A, Santee, California 92071. Ashlynn is a small, family-owned business, consisting of around thirty (30) employees, that engages in the procurement, manufacturing and distribution of various kratom products.  It sells those products throughout the United States.

11.     Defendant Erica Pan is sued in her official capacity as the Director of CDPH, which is a State of California regulatory entity responsible for jointly issuing regulations to implement Cal. Health & Safety Code §§ 111860-111865.

12.     Rob Bonta is sued in his official capacity as the Attorney General of California. The Attorney General's office is empowered to enforce the provisions of Cal. Health & Safety Code §§ 111860-111865 that make their violation a civil offense.

## III. JURISDICTION

13.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 1343 because this case presents a federal question arising under the Commerce Clause of the U.S. Constitution and under 42 U.S.C. § 1983.

14.     This Court has authority to enjoin enforcement of Cal. Health & Safety Code §§ 111860-111865 under 42 U.S.C. § 1983 and to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## IV. VENUE

15.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because all Defendants maintain an office and conduct their official duties within this judicial district.

- 4 -

VERIFIED COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

16.     Additionally, substantial events giving rise to this lawsuit occurred and will continue to occur within this judicial district.  Plaintiff produces and distributes various kratom-containing products from California (including within this judicial district). The embargo currently in place by the CDPH is within this district.

## V.  FACTUAL BACKGROUND

### A.    THE U.S. KRATOM MARKET

17.     Kratom is a leaf grown on a tropical tree native to Southeast Asia.

18.     Kratom has been used in herbal medicine in Southeast Asia for centuries. Historically, many Asian cultures used kratom during socio-religious ceremonies; to treat chronic pain and various medical conditions; and to increase energy, focus, and enhance general well-being.

19.     Kratom was introduced to the United States no later than the 1970's; however, kratom's use in the U.S. was not formally studied until the beginning of 2007, and it did not become widespread until approximately 2011. Consumers' demand for kratom increased exponentially as its beneficial effects became more widely known.

20.     Although kratom can be used by consumers to increase energy, focus, and enhance general well-being, in recent decades it has also been reported that consumers are choosing kratom to mitigate symptoms of withdrawal, addiction, and substance use disorders—for example, to treat morphine addiction.

21.     The American Kratom Association ("AKA") estimates that 10-16 million people in the U.S. regularly use kratom by either eating its ground leaves or brewing them in tea.

22.     According to the AKA, U.S. surveys indicate that most consumers of kratom products are adults, aged 35-55, with jobs and health care insurance, who report that their consumption is primarily for health and well-being.

23.     Many consumers state that kratom products "worked better for them, had fewer side-effects than the FDA-approved medicines they had taken, and/or that

VERIFIED COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

they preferred natural products." A smaller fraction of consumers, including many veterans of the United States armed forces, consider kratom to be a "lifeline" or a path away from opioids.

24.    All the kratom sold in the United States is imported from Southeast Asia, primarily from Indonesia.  Based on information and belief, the vast majority of kratom that is imported into the United States is shipped through ports of entry located within the State of California.

**B.    THERE IS LITTLE SCIENTIFIC EVIDENCE THAT KRATOM IS UNSAFE FOR HUMAN CONSUMPTION AND SUBSTANTIAL EVIDENCE THAT KRATOM IS BENEFICIAL**

25.    For more than a decade, kratom has been the subject of significant misinformation and unfounded claims grounded in flawed scientific analysis. This inconsistency is reflected in the contradictory positions taken—at times—by the federal government.

26.    For example, on August 31, 2016, the U.S. Drug Enforcement Administration ("DEA") issued a Notice of Intent to temporarily schedule kratom into Schedule I of the Controlled Substances Act ("CSA") pursuant to the CSA's temporary scheduling provisions.

27.    On October 17, 2017, the U.S. Department of Health and Human Services ("HHS") formally recommended that the DEA permanently classify kratom as a Schedule I substance under the CSA.

28.    Less than a year later, on August 16, 2018, HHS rescinded its recommendation. The agency cited "new data" and a "relative lack of evidence" to justify its change in position, concluding that there was insufficient support for scheduling kratom as a controlled substance.

29.    In its August 16, 2018, letter, HHS warned that "there is a significant risk of immediate adverse public health consequences for potentially millions of users if kratom or its components are included in Schedule I, such as suffering with

VERIFIED COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

1  intractable pain, kratom users switching to highly lethal opioids . . . inhibition of

2  patients discussing kratom use with their primary care physicians leading to more

3  harm . . . [and] the stifling effect of classification in Schedule I on critical research

4  needed on the complex and potentially useful chemistry of components of kratom."

5      30.    In 2021, at the request of the U.S. Food and Drug Administration

6  ("FDA"), the World Health Organization's ("WHO") Expert Committee on Drug

7  Dependence conducted an independent review of kratom and concluded that it posed

8  little risk to public health. The committee unanimously determined that there was

9  "insufficient evidence" to warrant international scheduling of the substance. WHO's

10  Expert Committee also unanimously concluded that there was "insufficient

11  evidence" to justify international scheduling of kratom.

12      31.    On September 19, 2024, FDA issued its preliminary results of its first

13  study on kratom products, a Single Ascending Dose study that assessed humans'

14  response to kratom.  The results clearly showed, as the agency put it, that "[k]ratom

15  leaves appear safe even at high doses when taken in capsule form." The study

16  involved 40 participants with no history of substance abuse. These participants were

17  administered single ascending doses of kratom in capsule form, starting from 1 gram

18  and increasing up to 12 grams, consumed within a five-minute period.  The results

19  indicated no significant adverse events, even at the highest doses.  FDA also noted,

20  "The data suggest that at the doses tested, using the specific botanical kratom sourced

21  for the study, and under carefully controlled clinical conditions . . . kratom was well

22  tolerated." Over the course of the study, FDA found no serious complications and

23  stated that it "recognize[s] that further studies are needed to advance our

24  understanding of kratom." The preliminary results from this study suggest that plain

25  leaf kratom, when used in controlled doses, may not pose the risks previously

26  highlighted by FDA.

27      32.    Following the completion of the Single Ascending Dose study, FDA

28  refused to participate in a hearing ordered by a federal judge on February 8, 2024, in

VERIFIED COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

SNELL
& WILMER

1  the Southern District of California.  The hearing would have required FDA to provide

2  witnesses and documents to prove the validity of its claims that kratom is a dangerous

3  substance.  In explaining its refusal, FDA informed the United States Attorney's

4  Office that "it had not yet made a determination regarding whether kratom is

5  dangerous."

6       33.    The National Institute of Drug Abuse has acknowledged that deaths

7  from overdosing on kratom seem to be "extremely rare." A 2019 study cited 11

8  deaths in the U.S. between 2011 and 2017 that were linked to kratom exposure,

9  including two deaths associated with kratom alone, compared with over 200,000

10 deaths stemming from opioid-related overdoses in that same period.

11 **C.    HISTORY OF KRATOM REGULATION & SAFETY**

12      34.    U.S. regulatory oversight of kratom is complex and varied.  Although

13 FDA's regulation of kratom as a food or dietary supplement has been inconsistent,

14 kratom products may be legally permitted to be produced, distributed, sold, and

15 consumed.

16      35.    FDA has stated that kratom, when added to food, is an unsafe food

17 additive and that kratom cannot be lawfully marketed as an ingredient in conventional

18 foods. This overly broad statement fails to address that kratom can also legally be

19 sold directly as a food or an ingredient in food if it is "generally recognized as safe"

20 ("GRAS") for such an intended use. FDA has remained silent on the GRAS status of

21 kratom.

22      36.    FDA has stated that kratom is a New Dietary Ingredient ("NDI") (a

23 dietary ingredient not sold in the U.S. prior to October 15, 1994) and cannot be legally

24 marketed in or as a dietary supplement because it believes there is not a basis to

25 provide that kratom does not present a significant or unreasonable risk of illness or

26 injury. This overly broad statement ignores the possibility that kratom was marketed

27 as a dietary supplement in the U.S. prior to October 15, 1994, and that there have

28 been approximately eight NDI Notifications submitted to FDA that each provide the

VERIFIED COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

Notifier's basis for concluding that kratom is reasonably expected to be safe and does not present a significant or unreasonable risk of illness or injury. Additionally, under the Food, Drug, and Cosmetic Act, the government bears the burden of proof on each element to show that a dietary supplement is adulterated and that a court shall decide such an issue on a de novo basis. FDA cannot simply declare all products containing kratom as adulterated.

37.    The current state of kratom as regulation among the individual states is a patchwork of both considered regulations and the absence of any kratom specific rules. This regulatory system reflects each state's individualized determination as to the best method for promoting and protecting the health and welfare of its residents.

38.    In the absence of clear and consistent federal oversight, many states have passed legislation regulating or controlling kratom in some manner.

39.    Seventeen (17) states have enacted a version of the Kratom Consumer Protection Act ("KCPA"), which explicitly permits kratom sales, subject to certain safety guard-rails.  Six (6) states have banned the sale of kratom.   The remaining states, like California, do not explicitly regulate the manufacturing, distribution and sale of kratom and kratom products.

40.    There are an additional eight (8) states that are currently considering passing KCPAs.   On February 20, 2025, California Assemblymember Bains introduced a KCPA, Assembly Bill 1088, in the California Assembly.  As currently drafted, the bill permits the manufacturing, sale and distribution of kratom products. A.B.1088 was passed through the Committee by a vote of 14-0 on May 23, 2025.  On June 2, 2025, A.B. 1088 passed the California House and was ordered to the Senate.

41.    A.B. 1088 would regulate and control the manufacturing and distribution of kratom in California at the state level by, among other things, prohibiting the sale of kratom products to individuals under 21 years of age; establishing labeling and packaging requirements; and prohibiting the sale and manufacture of kratom products that are attractive to children.

VERIFIED COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

1    **D.    CALIFORNIA ADMINISTRATIVE REGULATION OF KRATOM**

2    42.    Some regulators, like the CDPH, have used existing legislation to

3    regulate kratom.  The Cal. Health & Safety Code § 111860, challenged here, is a

4    statutory provision that empowers the CDPH to embargo adulterated, misbranded, or

5    falsely advertised foods, drugs, devices, and cosmetics.  The Cal. Health & Safety

6    Code § 111865, also challenged here, forbids embargoed foods from being removed,

7    sold, or disposed of *anywhere in the United States*.

8    43.    Under the Cal. Health & Safety Code, a product is "adulterated" if it

9    contains any "poisonous or deleterious substance that may render it injurious to

10    health of man or any other animal that may consume it."  The statute continues, "[t]he

11    food is not considered adulterated if the substance is a naturally occurring substance

12    and if the quantity of the substance in the food does not render it injurious to health."

13    44.    On their face and as applied by CDPH in this instance, Cal. Health &

14    Safety Code §§ 111860-111865 prevent Plaintiff from lawfully selling kratom

15    products to consumers in states whose legislatures have determined that access to

16    such kratom products is in consumers' best interests.

17    45.    On their face and as applied by CDPH in this instance, Cal. Health &

18    Safety Code §§ 111860-111865 also forbid Plaintiff from shipping kratom to out-of-

19    state customers whose purchases comply with all applicable state requirements in

20    their home states. A violation of Cal. Health & Safety Code §§ 111860-111865 is a

21    civil offense punishable by injunctive relief and fines.

22    46.    On their face and as applied by CDPH in this instance, Cal. Health &

23    Safety Code §§ 111860-111865 are inconsistent with scientific research and

24    regulations set by other states.  They impose restrictions on kratom sellers that

25    substantially interfere with commerce among the states in kratom products.  This will

26    ultimately increase costs for American consumers, making it more difficult for

27    people to lawfully access kratom products.  California does this for reasons that are

28

VERIFIED COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

1  both fallacious and vastly outweighed by the economic and social burdens the laws

2  imposes on out-of-state consumers.

3    47.   Because they reach extraterritorially to impose California's ban on other

4  states and their consumers, and because they impose burdens on interstate commerce

5  that far outweigh any of their benefits, Cal. Health & Safety Code §§ 111860-11865,

6  on their face and as applied by CDPH in this instance, violate the dormant Commerce

7  Clause and are unconstitutional.

8    48.   Plaintiff seeks a declaration that Cal. Health & Safety Code §§ 111860-

9  111865, as applied to its kratom products, violate the Commerce Clause and

10  principles of interstate federalism embodied in the U.S. Constitution, and an

11  injunction against the enforcement of Cal. Health & Safety Code §§ 111860-111865

12  concerning Plaintiff's kratom products.

13    49.   While Cal. Health & Safety Code §§ 111860-111865 regulate foods,

14  drugs, devices, and cosmetics that are adulterated, misbranded, or falsely advertised,

15  the basis of Plaintiff's challenge here is the extraterritorial reach and market

16  disruption of Cal. Health & Safety Code §§ 111860-111865, on their face and as

17  applied by CDPH in this instance.

18  **E.   CAL. HEALTH & SAFETY CODE §§ 111860-111865**

19    50.   Cal. Health & Safety Code § 111860 states that, "[w]henever an

20  authorized agent of the [CDPH] finds, or has probable cause to believe, that any food,

21  drug, device, or cosmetic is adulterated, misbranded, or falsely advertised within the

22  meaning of this part, or the sale of any food, drug, device, or cosmetic would be in

23  violation of this part, that agent shall affix to the food, drug, device, cosmetic, or

24  component thereof, a tag or other appropriate marking.  He or she shall give notice

25  that the food, drug, device, or cosmetic is, or is suspected of being, adulterated,

26  misbranded, falsely advertised, or the sale of which would be in violation of this part

27  and has been embargoed, and that *no person shall remove or dispose of the food,*

28

SNELL & WILMER

- 11 -

VERIFIED COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

1  *drug, device, or cosmetic by sale or otherwise until permission for removal or*

2  *disposal is given by an authorized agent of the department or the court.*"

3  51.    Cal. Health & Safety Code § 111865 further provides that "[i]t is

4  unlawful for any person to remove, sell, or dispose of a detained or embargoed food,

5  drug, device, or cosmetic without permission of an authorized agent of the

6  department or the court."

7  **F.    CAL. HEALTH & SAFETY CODE §§ 111860-111865 REGULATE**
   **WHOLLY OUT-OF-STATE CONDUCT**

8

9  52.    As applied by the CDPH in this instance, embargoes placed on "food[s],

10  drug[s], device[s], or cosmetic[s]" in California under Cal. Health & Safety Code §

11  111860 apply to the removal or disposal of such embargoed items, by sale or

12  otherwise, *anywhere in the United States*.

13  53.    The inevitable effect of Cal. Health & Safety Code §§ 111860-111865,

14  on their face and as applied by CDPH in this instance, is to prevent lawful out-of-

15  state sales of kratom products by California companies.

16  54.    By preventing lawful out-of-state sales of kratom products, Cal. Health

17  & Safety Code §§ 111860-111865 regulate commerce that does not affect California

18  customers.

19  55.    The extraterritorial reach of Cal. Health & Safety Code §§ 111860-

20  111865 is a substantial barrier to interstate commerce, which functions through a

21  well-established and complex supply chain in which many consumers and purchasers

22  of kratom live in states that permit the purchase, possession, and use of kratom

23  products.

24  56.    Embargoes placed on kratom products under Cal. Health & Safety Code

25  § 111860 and enforced under Cal. Health & Safety Code § 111865 prevent California

26  companies from shipping kratom products to consumers in states whose legislatures

27  have determined that kratom products present no in-state risk to consumers.

28

- 12 -

VERIFIED COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

57.    Embargoes placed under Cal. Health & Safety Code § 111860 and enforced under Cal. Health & Safety Code § 111865 on kratom products stored in California will also prevent willing consumers outside of California from purchasing kratom products in transactions that take place wholly outside of California.

58.    The effect of embargoes placed on kratom products under Cal. Health & Safety Code § 111860 and enforced under Cal. Health & Safety Code § 111865 is to prevent commerce outside of California in states where the purchase of kratom products is lawful.

## VI.  GENERAL ALLEGATIONS

### A.    ASHLYNN's KRATOM BUSINESS

59.    Ashlynn has been actively engaged in the lawful sale of kratom since 2010.

60.    Ashlynn's customers include individual consumers and wholesalers/ distributors both within and outside of California.

61.    As of May 29, 2025, Ashlynn has sold kratom products to 1,027 customers outside of California.

62.    Ashlynn does not label its kratom products as food.

63.    Ashlynn's kratom product labels contain information required to provide consumers with a statement of facts about the product—for example, that the kratom product is comprised of kratom leaf; contains a certain number of capsules; is all natural; is not deemed fit for human consumption by FDA; and is not intended to diagnose, treat, cure, or prevent any disease.

64.    Ashlynn maintains a warehouse in Santee, CA, where it stores the kratom products it sells on its online marketplace.

65.    Customers across the United States purchase Ashlynn's kratom products through the online marketplace on Ashlynn's website.

66.    Purchasers of Ashlynn's kratom products tender payment online at the time of purchase, in the state where the purchaser resides.

VERIFIED COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

67.    After receiving a purchase order, Ashlynn ships kratom products via ground freight from its warehouse in Santee, CA, to customers across the United States, excluding Alabama; Arkansas; Indiana; Rhode Island; Vermont; Wisconsin; San Diego, California; Oceanside, California; Denver, Colorado; Sarasota County, Florida; or Jerseyville, Indiana.

68.    On May 15, 2025, CDPH inspected Ashlynn's Santee, CA, warehouse.

69.    CDPH claimed that Ashlynn "unlawfully manufactured and held adulterated products that contain an unsafe food additive."  Though it alleged the kratom product was "adulterated" it failed to allege how or if the kratom contained in the products is a "poisonous or deleterious substance" as required by California law.

70.    CDPH also claimed that Ashlynn "unlawfully manufactured and held misbranded products" without describing how Ashlynn's products were misbranded.

71.    CDPH subsequently issued an embargo on "[a]ll [of Krave's] products containing kratom or kratom derivatives, including, but not limited to, raw ingredients, in-production and finished products including powders, capsules, liquids and tablets."

72.    On May 19, 2025, Ashlynn sent a response letter to CDPH opposing the embargo and arguing that its kratom products do not meet the statutory definition of food and that its embargo unlawfully violates the U.S. Constitution because it's an unlawful restraint on interstate commerce.

73.    On May 27, 2025, CDPH issued a regulatory letter to Ashlynn.  In the letter, CDPH stated that it "will continue to take regulatory action on kratom products manufactured, warehoused, distributed, and sold in California."

74.    CDPH also stated in its May 27, 2025, letter that it would "refer the matter to the Office of the District Attorney for commencement of condemnation proceedings" if Ashlynn does not submit a disposition plan for the embargoed kratom products.

- 14 -

VERIFIED COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

75.    As of May 28, 2025, Ashlynn has 17 out-of-state customers who have purchased kratom products and are awaiting shipments from Ashlynn's California warehouse.

76.    As a condition of the embargo, Ashlynn may not remove or dispose of such embargoed items, by sale or otherwise, anywhere in the United States.

77.    The kratom products embargoed by the State of California can be lawfully transported to and sold in at least forty-four (44) other states.

78.    Plaintiff is subject to imminent risk of enforcement action by the CDPH.

**B.    THERE IS NO WELFARE BENEFIT TO CALIFORNIA RESIDENTS FROM PREVENTING COMPANIES FROM LAWFULLY SELLING KRATOM TO OUT-OF-STATE CONSUMERS**

79.    At least seventeen (17) states have determined that providing their residents with well-regulated access to kratom products is in the legitimate local public interest. Twenty-eight (28) other states have not legislatively spoken on the issue and do not prohibit the sale of kratom products.

80.    As applied to kratom products, Cal. Health & Safety Code §§ 111860 – 111865 prevent consumers in those twenty-eight (28) states from engaging in commercial activity that their legislatures have deemed to be beneficial to welfare.

81.    While protecting California consumers from kratom products that the CDPH has deemed adulterated may serve a legitimate local public interest, extending that embargo to prevent out-of-state consumers from accessing kratom does not. This is especially true where the basis for declaring the product adulterated is solely its identity as kratom, rather than the presence of any poisonous or deleterious substances.

82.    Cal. Health & Safety Code §§ 111860-111865, on their face and as applied to kratom products, impose California's regulatory regime onto other states and do not directly achieve CDPH's stated goal of keeping California consumers safe.

SNELL & WILMER

VERIFIED COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

83.   Preventing companies from lawfully selling kratom products to consumers outside of California will not advance the welfare of California residents.

## VII.  FIRST CLAIM FOR RELIEF

(Discrimination Against Interstate Commerce (U.S. Const. art. I, § 8)

84.   Plaintiff re-alleges and incorporates by reference all of the preceding paragraphs.

85.   The Commerce Clause affirmatively grants Congress the power to "regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8.

86.   The dormant Commerce Clause restricts states from engaging in economic protectionism.

87.   On their face and as applied to Plaintiff's kratom products, Cal. Health & Safety Code §§ 111860-111865 discriminate against out-of-state buyers and markets for kratom products.

88.   On their face and as applied to Plaintiff's kratom products, Cal. Health & Safety Code §§ 111860-111865 reserve kratom products for in-state use and limit the supply of kratom products to out-of-state retailers and consumers.

89.   Export restrictions under Cal. Health & Safety Code §§ 111860-111865, on their face and as applied to Plaintiff's kratom products, burden interstate commerce and are protectionist in nature.

90.   Defendants are purporting to act within the scope of their authority under state law in implementing Cal. Health & Safety Code §§ 111860 – 11865.

91.   Defendants are liable to Plaintiff for proper redress under 42 U.S.C. § 1983 because Cal. Health & Safety Code §§ 111860 – 111865 deprive Plaintiff of the rights, privileges, and immunities secured by the Commerce Clause of the U.S. Constitution.

92.   Absent declaratory and injunctive relief, Plaintiff will suffer irreparable harm.

SNELL & WILMER

VERIFIED COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

## VIII.  SECOND CLAIM FOR RELIEF

(Impermissible Extraterritorial Regulation) (U.S. Const. art. I, § 8)

93.    Plaintiff re-alleges and incorporates by reference all of the preceding paragraphs.

94.    The dormant Commerce Clause restricts states from engaging in extraterritorial regulation that directly regulates out-of-state transactions by those with no connection to that state.

95.    A state law that has the practical effect of regulating commerce occurring outside the state is invalid under the Commerce Clause.

96.    On their face and as applied to Plaintiff's kratom products, Cal. Health & Safety Code §§ 111860 – 111865 violate the Commerce Clause and principles of interstate federalism by regulating kratom producers and the kratom market outside the State of California.

97.    On their face and as applied to Plaintiff's kratom products, Cal. Health & Safety Code §§ 111860 – 111865 extend California's police powers beyond its borders by regulating conduct that occurs outside the state by those with no connection to California.

98.    Defendants are purporting to act within the scope of their authority under state law in implementing Cal. Health & Safety Code §§ 111860 – 111865.

99.    Defendants are liable to Plaintiff for proper redress under 42 U.S.C. § 1983 because Cal. Health & Safety Code §§ 111860 – 111865 deprive Plaintiff of the rights, privileges, and immunities secured by the Commerce Clause of the U.S. Constitution and principles of interstate federalism embodied in its structure.

100.    Absent declaratory and injunctive relief, Plaintiff will suffer irreparable harm.

SNELL & WILMER

VERIFIED COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

## IX.  THIRD CLAIM FOR RELIEF

(Excessive Burden on Interstate Commerce in Relation to Putative Local Benefits) (U.S. Const. art. I, § 8)

101.  Plaintiff re-alleges and incorporates by reference all of the preceding paragraphs.

102.  The Commerce Clause restricts states from placing burdens on interstate commerce that are clearly excessive when compared to the putative local benefits.

103.  On their face and as applied to Plaintiff's kratom products, Cal. Health & Safety Code §§ 111860 – 111865 place excessive burdens on interstate commerce without advancing any legitimate local interest.

104.  Embargoes placed under Cal. Health & Safety Code § 111860 are not justified by any human welfare interest.

105.  Defendants are purporting to act within the scope of their authority under state law in implementing Cal. Health & Safety Code §§ 111860 – 111865.

106.  Defendants are liable to Plaintiff for proper redress under 42 U.S.C. § 1983 because Cal. Health & Safety Code §§ 111860 – 111865 deprive Plaintiff of the rights, privileges, and immunities secured by the Commerce Clause of the U.S. Constitution.

107.  Absent declaratory and injunctive relief, Plaintiff will suffer irreparable harm.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

1.    A declaratory judgment, pursuant to 28 U.S.C. § 2201, that the embargo over Plaintiff's kratom products is invalid to the extent it violated the U.S. Constitution and is unenforceable;

2.    A declaratory judgment, pursuant to 28 U.S.C. § 2201, that Cal. Health & Safety Code §§ 111860 – 111865 are invalid because they violate the U.S. Constitution and are unenforceable;

SNELL
& WILMER

VERIFIED COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF

3.  A permanent injunction enjoining the Defendants from implementing or enforcing Cal. Health & Safety Code §§ 111860-111865 as they relate to Plaintiff's kratom products intended for export to other states;

4.  An order awarding Plaintiff its costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

5.  Such other and further relief as the Court deems just and proper.

Dated:  June 4, 2025                    SNELL & WILMER L.L.P.


                                        By: s/ Andrew P. Young
                                            Andrew P. Young
                                            Emily E. Statham*
                                            apyoung@swlaw.com
                                            estatham@swlaw.com

                                        AMIN WASSERMAN GURNANI
                                            Robert Durkin, PA*
                                            rdurkin@awglaw.com

                                            Attorneys for Plaintiff Ashlynn
                                            Marketing dba KRAVE
                                        *Pro hac vice application forthcoming

VERIFIED COMPLAINT FOR
DECLARATORY
AND INJUNCTIVE RELIEF